## AFFIDAVIT IN SUPPORT OF COMPLAINT AND ARREST WARRANT

I, ▇▇▇▇▇▇▇▇▇, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, being duly sworn according to the law, hereby state that the facts set forth in this affidavit are true and correct to the best of my knowledge, information, and belief:

## INTRODUCTION AND AGENT BACKROUND

1. Your Affiant, ▇▇▇▇▇▇▇▇▇ is a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), United States Department of Justice, with the meaning of Title 18, United States code, Section 3051, and is an officer of the United States empowered by law with the duty of enforcing any of the criminal, seizure, or forfeiture provisions of the laws of the United States.

2. Your Affiant's primary duties consist of the enforcement of federal firearms laws, armed narcotics trafficking laws and conspiracy laws. Prior to graduating from the Federal Law Enforcement Training Center in 2020 and becoming an ATF Special Agent, Your Affiant was employed with Ernst and Young for over four (4) years, working as a Senior Forensic Accountant in Ernst and Young's Forensic Accounting practice. While employed as an ATF Special Agent, Your Affiant has conducted and participated in numerous federal investigations. Your Affiant has participated in the execution of numerous federal and state search warrants involving violent crime, organized crime, illegal firearms possession, firearms trafficking, the use and trafficking of narcotics, and armed narcotics trafficking. Your Affiant is familiar with federal criminal laws pertaining to firearms and drug violations.

3. Your Affiant works with other law enforcement officers with decades of experience enforcing federal firearms laws, and Your Affiant benefits from their knowledge. Your Affiant investigates violations of federal firearms laws and federal narcotics laws in the normal course of his duties and is familiar with the facts of this case.

4. The statements contained in this affidavit are based, in part, on information provided by Special Agents and Task Force Officers of the ATF and other law enforcement officers; on conversations held with police officers; and on Your Affiant's background and experience as a Special Agent of the ATF. Your Affiant has not included every fact known to Your Affiant concerning this investigation. Your Affiant has set forth only the facts that Your Affiant believes are necessary to establish the required foundation for an order authorizing the arrest of Willangel Maieyker Martinez-Sanoja.

## AFFIDAVIT PURPOSE

5. This affidavit is submitted to support a criminal complaint and application for arrest warrants for and against Willangel Maieyker Martinez-Sanoja. Your Affiant submits that between on or about March 12, 2025, and on or about March 28, 2025, in the State and District of Colorado, the defendant, Willangel Maieyker Martinez-Sanoja, committed violations of 21 U.S.C. §§ 841(a)(1) and (b)(1)(E) and 846 as summarized in the conclusion section below.

6. Because this affidavit is submitted only to obtain a criminal complaint and arrest warrant, I have set forth only those facts I believe are necessary to establish probable cause for the above-mentioned offenses.

7. The facts in this affidavit come from my personal observations, interviews, police reports, body camera footage, jail calls, my training and experience, and information obtained from other agents, law enforcement officials, and witnesses. This affidavit is intended to show merely

2

that there is sufficient probable cause for the requested arrest warrant and does not set forth all of my knowledge about this matter.

## INVESTIGATION

8. The United States, including the ATF, is conducting a criminal investigation of Willangel Maieyker Martinez-Sanoja, and both identified and unidentified co-conspirators regarding possible violations of 21 U.S.C. § 841(a)(1), and 21 U.S.C. § 846 (hereinafter "the Subject Offenses").

9. In October of 2024, the ATF began an investigation into armed narcotics and firearms trafficking activities occurring in the Denver, CO area, stemming from information obtained from the Arapahoe County Sheriff's Office. A Confidential Informant ("CI") was directed by Your Affiant to frequent an apartment complex that had an increase in violent crime and drug activities in the Denver metro area and obtain information relating to individual(s) engaged in criminal activity. The CI has been given monetary compensation in exchange for giving law enforcement reliable information on criminal activities on dozens of prior occasions, and no information provided by the CI has subsequently proven false. He/she is not trying to reduce any sentence in exchange for his/her cooperation. The CI has past felony convictions, but none within the last 9 years, and none involving falsehoods or deception.

10. According to the CI, he/she met an individual identified as L. A. P. on or about October 9, 2024, in the area of a Conoco gas station, located at 2280 S Quebec St, Denver, CO 80231. During the initial interaction, L. A. P. discussed with the CI that L. A. P. was from Venezuela and has numerous associates in the Denver and Aurora areas who are also from Venezuela. Over the course of the next several weeks, the CI and L. A. P. engaged in recorded communications in which L. A. P. purported to be involved in firearms trafficking activities with his criminal associates.

3

11. Between October 9, 2024, and February 27, 2025, ATF undercover agents (UCs) conducted numerous undercover meetings with suspects in this investigation. During these undercover meetings, UCs purchased a variety of items of evidentiary value to include firearms, ammunition, firearms parts and accessories, suspected cocaine, and tusi (a narcotic that is known on the street to contain a mixture of ketamine, methamphetamine, cocaine, MDMA, LSD, and other common street level narcotics). The undercover meetings discussed below are only those with relevance specifically as it pertains to the criminal activities of Willangel Maieyker Martinez-Sanoja.

12. Between February 27, 2025, and March 6, 2025, at the direction of the ATF, the CI engaged in conversation with L. A. P. regarding purchasing multiple firearms from L. A. P. and his criminal associates, which included E. V. M. Then, from March 6, 2025, through March 12, 2025, the CI and UCs met and engaged in conversations and purchases of firearms and illegal narcotics from E. V. M.

### *March 12, 2025, Undercover Purchase*

13. On March 12, 2025, E. V. M., along with three other previously unidentified individuals (who were subsequently identified as Willangel Maieyker Martinez-Sanoja, G. M. U. B., and Y. S. A. M.) met with the UCs in Denver, CO, to sell firearms and tusi to the UCs. During the undercover meeting, Y. S. A. M. produced eight firearms, specifically:

   a. Walther, model PPQ, 9mm caliber pistol bearing serial number FCF5643, with a magazine
   b. Glock, model 30S, .45 caliber pistol bearing serial number BWWS600, with a magazine
   c. Glock, model 19, 9mm caliber pistol bearing serial number BCCS258, with a magazine
   d. Sig Sauer, model P220 SAS, .45 caliber pistol bearing serial number 37A006187
   e. Glock, model 43, 9mm caliber pistol bearing serial number BDXB479, with a magazine

4

   f. Taurus, model G2C, 9mm caliber pistol bearing serial number 1C122977, with a magazine

   g. Smith & Wesson, model .357 magnum, .357 caliber revolver bearing serial number CZY4423

   h. Ruger, model SP101, .357 caliber revolver bearing serial number 574-81449

14. Prior to purchasing the firearms, Martinez-Sanoja and E. V. M. each produced a small baggie of tusi. In total, the two bags of tusi provided by the suspects weighed approximately 46 grams. The UCs advised Martinez-Sanoja, E. V. M., G. M. U. B., and Y. S. A. M. that the UCs needed to purchase the tusi before they would purchase the firearms. The UCs spoke to the suspects about the price of the tusi. After the suspects and the UCs agreed upon a price, the UCs paid Martinez-Sanoja $2,400 in pre-recorded buy money/U.S. currency for the purchase of approximately 46 grams of tusi, a controlled substance containing a suspected mixture of methamphetamine, MDMA, cocaine, LSD, and ketamine. Preliminary lab testing indicates at least the presence of ketamine, a Schedule III controlled substance, in the tusi, and further testing is pending.

15. The UCs then discussed the prices for all the firearms and ammunition. The UCs paid Y. S. A. M. $10,000 in pre-recorded buy money/U.S. currency for the purchase of the eight firearms and assorted ammunition. During the undercover interaction, Y. S. A. M. took out his cell phone and showed the UCs and CI pictures of firearms with Glock switch machinegun conversion devices on them, as well as a firearm that Y. S. A. M. advised was a fully automatic MAC-10 machine gun. The UCs and CI advised the suspects that the UCs were purchasing the firearms to transport the firearms to Mexico and sell the firearms for profit to individuals in Mexico. Y. S. A. M. advised the UCs and CI that Y. S. A. M. would continue to do business selling firearms to the UCs. G. M. U. B., who drove Martinez-Sanoja and E. V. M. to the undercover meeting, was observed handling a firearm during the undercover interaction.

5

### *Undercover Purchase – March 28, 2025*

16.     Between March 12, 2025, and March 28, 2025, at the direction of ATF, the CI engaged in conversation with E. V. M. regarding purchasing multiple firearms and tusi from E. V. M. and his criminal associates.

17.     On March 28, 2025, E. V. M., along with G. M. U. B., Martinez-Sanoja, and an unidentified Hispanic female, met with ATF UCs to sell firearms and tusi to the UCs. G. M. U. B. arrived at the undercover meeting in a vehicle by himself. Martinez-Sanoja, E. V. M., and the unidentified Hispanic female arrived at the undercover meeting driving a different vehicle. During the undercover meeting, G. M. U. B. arrived at the undercover meeting carrying a light tan colored bag. G. M. U. B. then produced two firearms from the bag, specifically:

    a. Taurus, model G2C, 9mm caliber pistol, bearing serial number AED325378

    b. Taurus, model 44 Magnum, .44 Special caliber revolver, bearing serial number NK161487

18.     The UCs then discussed the prices for the firearms and ammunition with the suspects. The UCs paid E. V. M. $2,200 in pre-recorded buy money/U.S. currency for the purchase of the firearms and ammunition.

19.     During this interaction, E. V. M. produced a black baggie containing tusi. The UCs then discussed the price of the tusi with the suspects. E. V. M. and Martinez-Sanoja advised that Martinez-Sanoja is the individual who manufactured the tusi. The UCs paid E. V. M. $2,600 in pre-recorded buy money/U.S. currency for the purchase of approximately two (2) ounces (57 grams) of tusi, a controlled substance containing a suspected mixture of methamphetamine, MDMA, cocaine, LSD, and ketamine.

6

## *NIBIN Intelligence*

20. All of the firearms described above, except those firearms that contain no make, no model, or no serial numbers, were preliminarily examined by ATF ▮▮▮▮▮▮▮▮▮▮, who has acquired knowledge and experience relating to firearms and ammunition and specifically the interstate nexus determination of firearms and ammunition through training, investigations, extensive research and review of records, as well as conferring with other experts and contacts within the firearms industry. Based on SA ▮▮▮▮▮ preliminary examinations, all the firearms described above, except those firearms that contain no make, no model, or no serial numbers, are firearms as defined in Title 18 U.S.C., Chapter 44, Section 921(a)(3), and that these firearms were not manufactured in the State of Colorado, and therefore traveled in and/or affected interstate and/or foreign commerce prior to being recovered as part of this investigation.

21. The firearms discussed above that were either purchased by the UCs or recovered subsequent to the arrest of the individuals referenced above were placed into ATF evidence. After the firearms were entered into evidence, they were test fired, and the spent shell casings from the test fires were entered into the National Integrated Ballistic Information Network (NIBIN) database for criminal intelligence purposes. The firearms discussed above have functioned as designed and meet the definition of a "firearm" as defined in 26 U.S.C. § 5845(a)(6). After the spent shell casings were entered into the NIBIN database, several of the firearms referenced above were determined to match spent shell casings from several crime scenes.

22. As discussed previously, ATF purchased a Glock, 30SF, .45 caliber pistol, bearing serial number BWWS600, which was purchased on March 12, 2025. After the test fired casings from this firearm were entered into the NIBIN database, it was determined the test fired shell casings matched spent shell casings recovered from three (3) shooting incidents. In September of 2024,

7

casings were recovered in a shots fired incident involving occupants of two vehicles shooting at each other. In December of 2024, casings were recovered in a shots-fired incident involving occupants shooting from a vehicle and fleeing the area. In March of 2025, casings were recovered in a shots-fired incident involving Hispanic males exchanging gunfire in the parking lot of an apartment complex.

23. As discussed previously, the ATF purchased a Taurus, G2C, 9mm pistol, bearing serial number 1C122977, which was purchased on March 12, 2025. After the test fired casings from this firearm were entered into the NIBIN database, it was determined the test fired shell casings matched spent shell casings recovered from one (1) shooting incident. In January of 2025 casings were recovered in a shooting at an apartment complex.

24. As discussed previously, the ATF purchased a Taurus, model G2C, 9mm caliber pistol, bearing serial number AED325378 on March 28, 2025. After the test fired casings from this firearm were entered into the NIBIN database, it was determined the test fired shell casings matched spent shell casings recovered from an attempted homicide that occurred in August of 2024 where a large group exchanged gunfire with each other. The test fired casings also matched spent shell casings recovered from an aggravated assault shooting involving a group of Hispanic males that occurred in December of 2024.

**CONCLUSION**

25. Based on the aforementioned information, Your Affiant submits that probable cause exists that on or about March 12, 2025, through March 28, 2025, in the State and District of Colorado, the defendant, Willangel Maieyker Martinez-Sanoja, distributed, and conspired to distribute, a mixture or substance containing a detectable amount of ketamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(E), and 846.

8

26. As such, Your Affiant respectfully requests that the Court issue a criminal complaint and a corresponding arrest warrant for and against Willangel Maieyker Martinez-Sanoja.

27. I, ███████, Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), being duly sworn, hereby depose and state that the above-mentioned information is true to the best of my information, knowledge and belief.



/s/ ███████
ATF Special Agent

**Affidavit reviewed and submitted by Garreth Winstead, Assistant United States Attorney.**

Sworn to and subscribed before me this 9th day of April, 2025.

CYRUS Y. CHUNG
United States Magistrate Judge
District of Colorado

9