## AFFIDAVIT IN SUPPORT OF COMPLAINT AND ARREST WARRANT

I, ██████████, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, being duly sworn according to the law, hereby state that the facts set forth in this affidavit are true and correct to the best of my knowledge, information, and belief:

## INTRODUCTION AND AGENT BACKROUND

1.      Your Affiant, ██████████, is a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), United States Department of Justice, with the meaning of Title 18, United States code, Section 3051, and is an officer of the United States empowered by law with the duty of enforcing any of the criminal, seizure, or forfeiture provisions of the laws of the United States.

2.      Your Affiant's primary duties consist of the enforcement of federal firearms laws, armed narcotics trafficking laws and conspiracy laws.  Prior to graduating from the Federal Law Enforcement Training Center in 2020 and becoming an ATF Special Agent, Your Affiant was employed with Ernst and Young for over four (4) years, working as a Senior Forensic Accountant in Ernst and Young's Forensic Accounting practice. While employed as an ATF Special Agent, Your Affiant has conducted and participated in numerous federal investigations.  Your Affiant has participated in the execution of numerous federal and state search warrants involving violent crime, organized crime, illegal firearms possession, firearms trafficking, the use and trafficking of narcotics, and armed narcotics trafficking. Your Affiant is familiar with federal criminal laws pertaining to firearms and drug violations.

3.      Your Affiant works with other law enforcement officers with decades of experience enforcing federal firearms laws, and Your Affiant benefits from their knowledge. Your Affiant investigates violations of federal firearms laws and federal narcotics laws in the normal course of his duties and is familiar with the facts of this case.

4.      The statements contained in this affidavit are based, in part, on information provided by Special Agents and Task Force Officers of the ATF and other law enforcement officers; on conversations held with police officers; and on Your Affiant's background and experience as a Special Agent of the ATF. Your Affiant has not included each and every fact known to Your Affiant concerning this investigation. Your Affiant has set forth only the facts that Your Affiant believes are necessary to establish the required foundation for an order authorizing the arrest of Jose David Rivas-Mendez, Deomar Armando Mendez-Chavez, Dannys Alexis Moncada-Arteaga, and Jose Daniel Bencomo-Gutierrez.

## AFFIDAVIT PURPOSE

5.      This affidavit is submitted to support a criminal complaint and application for arrest warrant for and against Jose David Rivas-Mendez, Deomar Armando Mendez-Chavez, Dannys Alexis Moncada-Arteaga, and Jose Daniel Bencomo-Gutierrez.

6.      Your Affiant submits that from on or about April 16, 2025, through May 15, 2025, in the State and District of Colorado, the defendant, Jose David Rivas-Mendez, Deomar Armando Mendez-Chavez, Dannys Alexis Moncada-Arteaga, and Jose Daniel Bencomo-Gutierrez, along with

both identified and unidentified co-conspirators, used a facility of interstate commerce with the intent to commit murder for hire, and conspired to do the same, in violation of 18 U.S.C. § 1958(a).

7.      Because this affidavit is submitted only to obtain a criminal complaint and arrest warrant, I have set forth only those facts I believe are necessary to establish probable cause for the above-mentioned offenses.

8.      The facts in this affidavit come from my personal observations, interviews, police reports, body camera footage, jail calls, my training and experience, and information obtained from other agents, law enforcement officials, and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested arrest warrant and does not set forth all of my knowledge about this matter.

## INVESTIGATION

9.      The United States, including the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), is conducting a criminal investigation of Jose David Rivas-Mendez, Deomar Armando Mendez-Chavez, Dannys Alexis Moncada-Arteaga, and Jose Daniel Bencomo-Gutierrez, and both identified and unidentified co-conspirators regarding violations of Use of a facility of interstate commerce with the intent to commit murder for hire, and conspiracy to do the same, in violation of 18 U.S.C. § 1958(a) (hereinafter "the Subject Offenses").

10.     In October of 2024, the ATF began an investigation into armed narcotics and firearms trafficking activities occurring in the Denver, CO area, stemming from information obtained from the Arapahoe County Sheriff's Office. A Confidential Informant ("CI") was directed by Your Affiant to frequent an apartment complex with an increase in criminal activity, located in Denver, CO, to obtain information relating to individual(s) engaged in criminal activity. The CI has been given monetary compensation in exchange for giving law enforcement reliable information on criminal activities on dozens of prior occasions, and no information provided by the CI has subsequently proven false. He/she is not trying to reduce any sentence in exchange for his/her cooperation.  The CI has past felony convictions, but none within the last 9 years, and none involving falsehoods or deception.

11.     According to the CI, he/she met an individual identified as Luis Aguilera-Pericaguan on or about October 9, 2024, in the area around the Ivy Crossing Apartment Homes complex. During the initial interaction, Aguilera-Pericaguan. discussed with the CI that Aguilera-Pericaguan. was from Venezuela and has numerous associates in the Denver and Aurora areas who are also from Venezuela. Over the course of the next several weeks, the CI and Aguilera-Pericaguan. engaged in recorded communications in which Aguilera-Pericaguan. purported to be involved in firearms trafficking activities with his criminal associates.

12.     Between October 9, 2024, and March 26, 2025, ATF undercover agents (UCs) conducted numerous undercover meetings with both indicted and unindicted co-conspirators in this investigation. During these undercover meetings, UCs purchased a variety of items of evidentiary value to include firearms, ammunition, firearms parts and accessories, cocaine, and tusi, which is a narcotic known to originate from the country of Venezuela, is known to contain a variety of

controlled substances including ketamine, methamphetamine, MDMA, and other street level narcotics, and is typically manufactured to be pink in color.

  13. Additionally, during the undercover meetings not discussed below, both indicted and unindicted co-conspirators in this investigation openly discussed with the UCs a variety of criminal activities that are not charged in this complaint but are continued to be actively investigated. The criminal activities the co-conspirators purported to be involved in with their criminal associates included female sex trafficking, firearms trafficking, narcotics trafficking, ATM jackpotting, and violent criminal activities to include robberies, assaults, and extortions.

  14. The undercover meetings discussed below are only those with relevance as they pertain to the criminal activities of Jose David Rivas-Mendez, Deomar Armando Mendez-Chavez, Dannys Alexis Moncada-Arteaga, and Jose Daniel Bencomo-Gutierrez for the specific purpose of this criminal complaint.

### *Undercover Purchase – March 27, 2025*

  15. Leading up to March 27, 2025, at the direction of ATF, the CI engaged in conversation with Aguilera-Pericaguan regarding purchasing firearms from Aguilera-Pericaguan and his criminal associates. Aguilera-Pericaguan was utilizing cellular phone number ▮▮▮▮▮▮ during these recorded conversations. The CI coordinated a meeting in Arvada, CO, with the CI, UCs, Aguilera-Pericaguan and a previously unidentified male (who was subsequently identified as Nelo Colmenarez-Morillo).

  16. On March 27, 2025, Aguilera-Pericaguan and Colmenarez-Morillo met with ATF UCs to sell a firearm to the UCs. During the meeting, Colmenarez-Morillo produced a Ruger, model Ranch Rifle, .223 caliber rifle, bearing serial number 582-26752. The UCs informed Colmenarez-Morillo that the UCs wanted to purchase the firearm to traffic the firearm down to Mexico. Colmenarez-Morillo, who is a citizen of Venezuela and is in the United States illegally, agreed to sell the firearm to the UCs. The UCs paid Colmenarez-Morillo with pre-recorded buy money/U.S. currency for the firearm. After the purchase of the firearms was completed, Aguilera-Pericaguan was paid an additional amount of pre-recorded buy money/U.S. currency as a brokerage fee for the firearm transaction.

  17. During the undercover meeting, Colmenarez-Morillo provided the UCs with the phone number ▮▮▮▮▮▮ and informed the UCs they could contact Colmenarez-Morillo to conduct future firearm transactions. Later, on March 27, 2025, Colmenarez-Morillo placed a call utilizing cell phone number ▮▮▮▮▮▮ to an ATF UC to discuss additional firearms transactions, as well as future narcotics transactions involving tusi.

  18. Also, during the undercover meeting, Aguilera-Pericaguan provided the UCs with the WhatsApp contact "Jose David Gordo" with the phone number ▮▮▮▮▮▮. The UCs did not immediately contact this WhatsApp contact.



*Undercover Purchase – March 28, 2025*

19.      Between March 27, 2025, and March 28, 2025, an ATF UC engaged in conversation with Colmenarez-Morillo regarding purchasing multiple firearms from Colmenarez-Morillo. Colmenarez-Morillo was utilizing cellular phone number ▮▮▮▮▮▮▮ during these recorded conversations.

20.      During the recorded conversations with a UC and Colmenarez-Morillo, Colmenarez-Morillo purported to the UC that Colmenarez-Morillo had the ability to sell a grenade containing explosives to the UC. The UC requested to meet with Colmenarez-Morillo to possibly purchase the grenade. Colmenarez-Morillo then informed the UC that Colmenarez-Morillo would have another individual contact the UC to coordinate the transaction involving firearms and grenades.

21.      On March 28, 2025, the individual utilizing WhatsApp contact "Jose David Gordo" with phone number ▮▮▮▮▮▮, contacted a UC and purported to have the ability to sell grenades to the UC. The individual remained in contact with the UC and subsequently met with ATF UCs at an ATF undercover controlled location (UC Location). The individual utilizing WhatsApp contact "Jose David Gordo" with phone number ▮▮▮▮▮▮ was subsequently identified as Jose David Rivas-Mendez.

22.      On March 28, 2025, Rivas-Mendez drove to the UC Location. During the undercover meeting, Rivas-Mendez produced two firearms, specifically, a Sig Sauer, model P320, 9mm caliber pistol, bearing serial number 58A086337, and a Ruger, model SR22, .22LR caliber pistol, bearing serial number 36566885. Both of these firearms were identified as stolen firearms. The UCs explained to Rivas-Mendez that the UCs traffic the firearms to Mexico to sell. Additionally, the UCs informed Rivas-Mendez they were interested in seeing if the grenades were real. Rivas-Mendez purported to the UCs the grenades were in fact real, but the UCs would have to coordinate an additional meeting with another individual to purchase the grenades. The UCs paid Rivas-Mendez with pre-recorded buy money/U.S. currency for the purchase of the firearms. Rivas-Mendez informed the UCs that he would contact them on WhatsApp to conduct a future firearms transaction.



*Undercover Communications – April 1, 2025*

23.     On April 1, 2025, the WhatsApp number ████████████, with the WhatsApp contact "Voy," contacted an ATF UC and offered multiple firearms and tusi for sale by sending pictures and videos of firearms and tusi. The UC engaged in recorded conversations with Voy discussing firearms and tusi transactions.

*Undercover Purchase – April 2, 2025*

24.     Between April 1, 2025, and April 2, 2025, an ATF UC engaged in conversation with Voy regarding purchasing firearms and tusi from Voy.

25.     On April 2, 2025, a UC received a recorded phone call from Voy advising that Voy's employees had arrived at the UC Location driving a green Camry. At the coordination of Voy, three previously unidentified males (subsequently identified as Moreno-Montes De Oca, Rosmer Javier Bello-Garcia, and ████████████) arrived at the UC Location driving a green older model Toyota Camry bearing Colorado license plate number DDP-V14, driven by Moreno-Montes De Oca, with Bello-Garcia in the front passenger seat and ████████████ in the rear driver side seat.

26.     During the meeting, Bello-Garcia produced a pink Ziplock baggie with hearts on it containing suspected narcotics, specifically tusi, which is known based on positive laboratory results in this investigation to contain a combination of ketamine, methamphetamine, MDMA, and other street level narcotics. As the UCs placed the bag containing suspected tusi on a digital scale, Moreno-Montes De Oca retrieved another digital scale from the Toyota Camry and placed the digital scale on the counter. The Ziplock baggie containing the suspected tusi weighed approximately 58 grams. The UCs asked the suspects about the price of the suspected tusi. Bello-Garcia and Moreno-Montes De Oca both confirmed the total price of the suspected tusi.

27.     The UCs asked Moreno-Montes De Oca, Bello-Garcia, and ████████████ if their boss (Voy) had sent the firearms that he had offered for sale. Moreno-Montes De Oca and Bello-

Garcia advised the UCs that the firearms would be sold at a separate transaction and the UCs just need to contact their boss to arrange the purchase of firearms.

28.     The UCs discussed with Moreno-Montes De Oca, Bello-Garcia, and ████████████ about females enjoying tusi. Bello-Garcia advised the UCs that Venezuelan women love tusi. The UCs counted out pre-recorded buy money/U.S. currency for the purchase of the firearms. Moreno-Montes De Oca advised the UCs that he need to take a picture of the pre-recorded buy money/U.S. currency to send to their boss to confirm the amount of money was correct for the purchase of the tusi.



***Undercover Communications – April 3, 2025***

29.     On April 3, 2025, the WhatsApp phone number ████████████, with the WhatsApp contact "~Peña alexdaniel 🎯 ⚙️ 😎," (referred to herein as "Alex Peña," although investigators know that name to be a pseudonym) contacted an ATF UC and offered multiple firearms for sale by sending pictures of firearms and prices for each firearm. The UC engaged with Alex Peña in recorded conversations and asked how Alex Peña obtained the UC's phone number. Alex Peña informed the UC that Alex Peña was the individual who coordinated the transaction when the UCs purchased a Ruger Ranch Rifle at an apartment complex on March 27, 2025. The UC remained in recorded contact with Alex Peña discussing future firearms and narcotics transactions.

***Undercover Meeting – April 9, 2025***

30.     Between April 3, 2025, and April 9, 2025, a UC engaged in recorded conversation with Rivas-Mendez regarding purchasing multiple firearms from Rivas-Mendez. Rivas-Mendez was utilizing WhatsApp phone number ████████████ during these recorded conversations. However, during this time period, Rivas-Mendez stopped engaging in conversation with the UC without an explanation.

31.     On April 9, 2025, without any notice, Rivas-Mendez drove to the UC Location and knocked on the door of the UC Location. As the UCs were at the UC Location for an unrelated

reason, the UCs were able to conduct an unanticipated undercover meeting with Rivas-Mendez. During the meeting, Rivas-Mendez informed the UCs that he had recently changed his cell phone number and did not have the UC's contact information. Rivas-Mendez then provided the phone number ████████ as his new phone number for the UCs to contact him on for future firearm transactions.

### *Undercover Purchase – April 16, 2025*

32.     Between April 9, 2025, and April 16, 2025, a UC engaged in conversation with Rivas-Mendez regarding purchasing multiple firearms and narcotics, specifically a drug referred to as "tusi" (a narcotic that is known on the street to contain a mixture of ketamine, methamphetamine, MDMA, and other street level narcotics), from Rivas-Mendez.

33.     On April 16, 2025, Rivas-Mendez drove to the UC Location to meet with the UCs. During the meeting, Rivas-Mendez produced two firearms specifically a Highpoint, model YC9, 9mm caliber pistol, bearing serial number YC004475, and a Remington, model 783, .308 caliber rifle, bearing serial number RA67467B. The UCs informed Rivas-Mendez that the UCs wanted to purchase the firearms to traffic the firearms down to Mexico. The UCs advised Rivas-Mendez they would not be able to make very much money on the firearms in Mexico because Rivas-Mendez was trying to sell the Remington rifle to the UCs for too much money. Rivas-Mendez then made a phone call to an unknown individual to discuss a final price for the rifle. After the phone call, Rivas-Mendez and the UCs agreed on a final price for both firearms.

34.     Rivas-Mendez agreed to sell the firearms to the UCs. The UCs paid Rivas-Mendez with pre-recorded buy money/U.S. currency for the firearms. Rivas-Mendez also produced approximately 58 grams of tusi to sell to the UCs. The UCs paid Rivas-Mendez with pre-recorded buy money/U.S. currency for the purchase of the 58 grams of tusi. Rivas-Mendez was paid an additional amount of pre-recorded buy money/U.S. currency as a brokerage fee for the firearms and narcotics transaction.

35.     Immediately after the purchase of the firearms and tusi was completed, Immediately after the purchase of the firearms and tusi was completed, the UCs asked Rivas-Mendez if he was still willing to assist the UCs with a vehicle repossession (a UC had previously asked Rivas-Mendez during recorded communications prior to the undercover meeting if he would be willing to assist with a vehicle repossession), and Rivas-Mendez agreed to help the UCs and CI with a vehicle repossession.  Rivas-Mendez advised the UCs that Rivas-Mendez needed to go and meet the individuals who had brought the firearms and narcotics to him to sell to the UCs so that Rivas-Mendez could pay them. Rivas-Mendez initially began walking down the alley to go meet the unknown individuals. The UCs told Rivas-Mendez that the UCs would take him to meet the unknown individuals. The UCs then drove Rivas-Mendez around the block of the UC Location. Rivas-Mendez directed the UCs to drive to a nearby park and park, and the UCs then parked the vehicle in the parking lot area of the park. Rivas-Mendez indicated to the UCs that the individuals that he was meeting were parked in a silver vehicle across the street from the park, and Rivas-Mendez subsequently exited the undercover vehicle and walked across the street to meet unknown individuals who were driving a silver Volkswagen Beetle sedan bearing Nebraska license plate number ████████. The UCs observed Rivas-Mendez meet the individuals outside the passenger's side of the vehicle and subsequently count out and pay the unknown individuals an unknown amount of money prior to returning to the undercover vehicle.

***Undercover Reposession Ruse – April 16, 2025***

36. After the above detailed undercover purchase, the UCs then conducted a "repossession" ruse, where they pretended to take a car from a person who owed them a debt. Rivas-Mendez accompanied them on this ruse operation.

37. Immediately after Rivas-Mendez got back into the UCV, he pointed to the silver Volkswagen Beetle sedan an advised the UCs and CI that the Hispanic males in that vehicle are associates of Rivas-Mendez who were ready to help the UCs with any type of job. Rivas-Mendez continued to discuss potential jobs that he would assist the UCs with, and Rivas-Mendez advised the UCs that he would be willing to kill people for a job if the UCs needed someone taken out. Rivas-Mendez advised the UCs and CI that the Hispanic males in the silver Volkswagen beetle would be willing to kill for a job as well. The UCs asked if Rivas-Mendez was talking about the type of violent crimes as seen on the news and Rivas-Mendez advised that all the UCs needed to do is call Rivas-Mendez and he would come and shoot anyone that the UCs needed him to shoot.

38. Rivas-Mendez advised the UCs and CI that when his organization is hired to conduct a job, like a murder, they would require half of the agreed upon payment up front prior to the initiation of the job, and the other half would be paid when the job is complete. The UCs and CI asked how many people Rivas-Mendez and his organization would typically use for this type of job. Rivas-Mendez advised the UCs and CI that the people in his organization require to know what the job is, how many people are needed for the job, and how much money they will get paid to complete the job before committing to any type of job. The UCs and CI asked Rivas-Mendez if his group had conducted these kinds of jobs before. Rivas-Mendez replied affirmatively. Rivas-Mendez further advised the UCs that the reason Rivas-Mendez and his associates don't sell the UCs all their firearms is because they keep some firearms for their own use in case they need them.

39. Rivas-Mendez reiterated to the UCs and CI that his associates in the silver Volkswagen Beetle are some of his most dangerous associates who are willing to conduct any type of violent job. Rivas-Mendez advised the UCs and CI that his associates who would assist with this type of violent job are Venezuelan. The UCs and CI then informed Rivas-Mendez that an individual owes the UCs some money and the UCs were going to repossess a car as payment for the debt owed

to the UCs. Rivas-Mendez continued to inform the UCs and CI that the people from his organization would take anyone out that the UCs needed if the UCs were willing to pay them. Rivas-Mendez advised the UCs and CI that the videos of the crazy crimes with Venezuelans in the news are Rivas-Mendez's people. Rivas-Mendez further advised that his people just needed to know in advance about a job and they would be willing to assist the UCs.

40.     The UCs pointed to the tattoo on Rivas-Mendez's left hand and asked him if the tattoo meant anything in his organization. Rivas-Mendez pulled up his left arm sleeve to show the UCs the tattoo on his left hand and arm and pointed to a lion and a crown on his left forearm. During the repossession of the vehicle, Rivas-Mendez advised the UCs and CI that Rivas-Mendez would be willing to hit an individual in the head with a wooden bat if an individual tried to stop the UCs from repossessing a vehicle. Rivas-Mendez then advised the UCs that he also knows an individual who lives approximately three (3) hours away who has access to grenades for the UCs to purchase.

41.     Rivas-Mendez advised the UCs that he regularly carries a pistol with him and stated that he currently has a personal firearm, that is a Glock 9mm pistol with an extended magazine. As the UCs, CI, and Rivas-Mendez began driving back to the undercover location after the conclusion of the vehicle repossession ruse operation, Rivas-Mendez advised the UCs and CI that Rivas-Mendez has associates ready with firearms to conduct any type of job on behalf of the UCs. Rivas-Mendez advised that he would put the UCs in contact with the leaders of his organization. The UCs asked Rivas-Mendez about his previous comments that he also had access to providing females for the UCs and their associates, and Rivas-Mendez pulled out his cell phone and showed the UCs and CI multiple pictures of a female who was available to hire out for sexual favors. Rivas-Mendez advised the UCs and the CI that it would be no big deal to provide five (5) females to the UCs and their associate for sexual favors.

### Undercover Purchase – April 17, 2025

42.     Between April 16, 2025, and April 17, 2025, a UC engaged in conversation with Rivas-Mendez regarding purchasing multiple firearms and tusi, from Rivas-Mendez. Rivas-Mendez was utilizing cellular phone number ████████ during these recorded conversations.

43.     On April 17, 2025, Rivas-Mendez drove to the UC Location to meet with the UCs. During the meeting, Rivas-Mendez produced a firearm specifically a Phoenix Arms, model HP22A, .22 caliber pistol, bearing serial number 324487. Rivas-Mendez agreed to sell the firearm to the UCs. The UCs paid Rivas-Mendez in pre-recorded buy money/U.S. currency for the firearm. Rivas-Mendez also produced approximately 86 grams of tusi to sell to the UCs. The UCs paid Rivas-Mendez for the purchase of the 86 grams of tusi. Rivas-Mendez was paid an additional amount in pre-recorded buy money/U.S. currency as a brokerage fee for the firearms and narcotics transaction.

44.     Immediately following the undercover interaction with Rivas-Mendez on April 17, 2025, mobile surveillance was conducted by SAs. During the surveillance operation, Rivas-Mendez was observed traveling back to ████ E Harvard Ave, Denver, CO 80231. Rivas-Mendez was observed entering building ████ E Harvard Ave, Denver, CO 80231, in the Ivy Crossing Apartment Homes complex, and walking to the second floor of the building.



***Undercover Purchase – April 17, 2025***

45.     Between April 2, 2025, and April 17, 2025, a UC engaged in conversation with Voy regarding purchasing multiple firearms and tusi from Voy. Voy was utilizing WhatsApp phone number ▇▇▇▇▇▇▇ during these recorded conversations.

46.     On April 17, 2025, a UC received an audio message from Voy advising that his employees had arrived at the UC Location in a gray Volkswagen and were looking for the UCs. At the coordination of Voy, Bello-Garcia and Moreno-Montes De Oca arrived at the UC Location driving a gray Volkswagen Beetle bearing Nebraska license plate number ▇▇▇▇▇ (the same vehicle observed receiving payment from Rivas-Mendez on 4/16/2025 as discussed above). During the meeting, Bello-Garcia produced a firearm, specifically a Jimenez Arms, model J.A. Nine, 9mm caliber pistol SN, 324487. Bello-Garcia agreed to sell the firearm to the UCs. The UCs confirmed with Bello-Garcia that the individual the UCs have been communicating with on WhatsApp phone number ▇▇▇▇▇▇▇ is Bello-Garcia's boss. The UCs advised Bello-Garcia that the unidentified boss had confirmed the price for the firearm. The UCs then paid Bello-Garcia with pre-recorded buy money/U.S. currency for the firearm. Bello-Garcia also produced approximately 86 grams of tusi to sell to the UCs. After the UCs counted out the pre-recorded buy money/U.S. currency for the tusi, Moreno-Montes De Oca took a picture of the money as he previously did during the transaction on 4/2/2025 as discussed above. The UCs paid Bello-Garcia for the purchase of the 86 grams of tusi.



*Undercover Purchase – April 24, 2025*

47.     Between April 17, 2025, and April 24, 2025, a UC engaged in conversation with Voy regarding purchasing multiple firearms and tusi from Voy. Voy was utilizing WhatsApp phone number ▇▇▇▇▇▇▇▇▇▇ during these recorded conversations.

48.     On April 24, 2025, Bello-Garcia, Moreno-Montes De Oca, and ▇▇▇▇▇▇▇▇▇▇ arrived at the UC Location driving a gray Volkswagen Beetle bearing Nebraska license plate number WZF-782 (the same vehicle observed receiving payment from Rivas-Mendez on 4/16/2025 and driven to the UC Location on 4/17/2025 to sell a firearm and tusi as discussed above). During the meeting, Bello-Garcia produced a firearm, specifically a Taurus, model G3C, 9mm caliber pistol, bearing serial number ABD475627. Bello-Garcia also produced a pink Ziplock baggie containing approximately 77 grams of suspected tusi. A UC counted out an amount of pre-recorded buy money/U.S. currency for the purchase of the firearm and the tusi. Bello-Garcia with pre-recorded buy money/U.S. currency for the firearm. A UC confirmed the price of the tusi, to which both Bello-Garcia and Moreno-Montes De Oca nodded in agreement with the agreed upon price. A UC counted out the total amount of money for both the firearm and the tusi. Just as he had done on previous undercover interactions, Moreno-Montes De Oca took a picture of the total amount of pre-recorded buy money/U.S. currency to send to his boss to confirm the amount was correct. also produced approximately 86 grams of tusi to sell to the UCs. The UCs paid Bello-Garcia for the purchase of approximately 77 grams of tusi and the firearm.



***Undercover Purchase – April 24, 2025***

49.     Between April 17, 2025, and April 24, 2025, a UC engaged in conversation with Rivas-Mendez and Alex Peña regarding purchasing multiple firearms and narcotics, specifically a drug called "tusi" as well as kilo quantities of methamphetamine, from Rivas-Mendez and Alex Peña. During these recorded communications Alex Peña was using WhatsApp phone number ▮▮▮▮ ▮▮▮▮▮▮, with the WhatsApp contact "~Peña alexdaniel 👁 👣 😎."

50.     On April 24, 2025, Rivas-Mendez drove to the UC Location to meet with the UCs. During the meeting, Rivas-Mendez produced two firearms specifically a Kel-tec, model Sub-2000, 9mm pistol, bearing S/N: FF0689, and an Essex Arms, model 1911, .45 caliber pistol, bearing S/N: 77206. Rivas-Mendez agreed to sell the firearms to the UCs. The UCs paid Rivas-Mendez in pre-recorded buy money/U.S. currency for the firearms. Rivas-Mendez also produced approximately 198 grams of tusi to sell to the UCs. The UCs paid Rivas-Mendez for the purchase of approximately 198 grams of tusi. Rivas-Mendez was paid an additional amount in pre-recorded buy money/U.S. currency as a brokerage fee for the firearms and narcotics transaction.



## *Undercover Purchase – April 25, 2025*

51.     Between April 3, 2025, and April 25, 2025, a UC engaged in conversation with Alex Peña regarding purchasing firearms and tusi from Alex Peña and his criminal associates. Alex Peña was utilizing WhatsApp phone number ███████████, with the WhatsApp contact "~Peña alexdaniel ◉ 👓 😎" during these recorded conversations.

52.     On April 25, 2025, Alex Peña sent the address "██ S Oneida St, Denver, CO 80224" to the UCs as an address to meet at for the purpose of purchasing a firearm, which is located at the Cedar Run apartment complex.  The UCs drove to ██ S Oneida St, Denver, CO 80224. While the UCs were in the parking lot, the UCs observed Bello-Garcia and Moreno-Montes De Oca exit the 3rd floor exterior door of building A carrying a black bag. Moreno-Montes De Oca was observed to be talking on a cell phone. Bello-Garcia and Moreno-Montes De Oca then walked downstairs and approached the UCs, with Bello-Garcia carrying the black bag. Both Bello-Garcia and Moreno-Montes De Oca entered the UC's vehicle. Bello-Garcia pulled out a firearm, specifically an STS Arms, model ST-4, multi-caliber rifle, bearing serial number 0508 from the black bag and handed it to UCs. The UCs asked Bello-Garcia and Moreno-Montes De Oca where Alex Peña was at, and Bello-Garcia advised that he was "cooking" as a reference to cooking tusi. While Moreno-Montes De Oca was on an active phone call with an individual, the UCs asked Moreno-Montes De Oca if he was on the phone call with the individual utilizing WhatsApp phone number ███████████, with the WhatsApp contact "~Peña alexdaniel ◉ 👓 😎", to which Moreno-Montes De Oca replied affirmatively. The UCs advised Moreno-Montes De Oca to tell Alex Peña to come down to meet the UCs to complete the sale of the firearm. Bello-Garcia advised that Alex Peña was cooking and was not going to come down.

53.     The UCs overheard Alex Peña ask Moreno-Montes De Oca if the UCs had provided the money for the firearm, to which Moreno-Montes De Oca stated "No." Upon overhearing Alex Peña on speakerphone, a UC stated, "Well come down so that we can meet you." Moreno-Montes De Oca then advised the UCs that the individual on the phone was not the same individual that the UCs had been talking to (Alex Peña). Moreno-Montes De Oca then said, "Ok, yes its him (Alex Peña) but he is not here and at another location." Moreno-Montes De Oca then gave his cellphone to a UC to speak with Alex Peña. A UC asked Alex Peña to come meet the UCs, to which Alex Peña replied, "I can't because I am at another apartment about 20 minutes away." A UC then asked Alex Peña if he was the same person that the UC had been negotiating the purchase of the firearm, to which Alex Peña replied, "Yes, I am the same person." The UC then compared the profile photo on the WhatsApp application that displayed on Moreno-Montes De Oca's phone to the profile photo on the WhatsApp application that displayed on the UCs phone and found that it was the same profile photo.

54.     The UC ended the phone call with Alex Peña on Moreno-Montes De Oca's cell phone. The UC then placed a phone call to Alex Peña via the WhatsApp application. The UC asked Alex Peña why he had told the UC that he was at the Cedar Run Apartments and now did not want to meet. Alex Peña then stated, "I am here cooking, but I'll contact you later and we can then meet." The UC then offered Alex Peña $1,500 for the STS Arms, model ST-4, multi-caliber rifle, bearing serial number 0508, to which Alex Peña replied, "No, the price was $2000." Alex Peña then further stated, "We bought that for $1400 and are not making any profit." In front of the Moreno-Montes De Oca and Bello-Garcia, the UC advised Alex Peña, "I don't make a profit when I sell this in Mexico. I

may make $2,000." The UC then offered Alex Peña $1,800 to which Alex Peña replied, "Ok." The UC then ended the phone call with Alex Peña.

55.     The UC paid Bello-Garcia with pre-recorded buy money/U.S. currency for the firearm. Bello-Garcia and Moreno-Montes De Oca exited the UCs vehicle and walked back into Building A. The UCs then left the Cedar Run apartment complex.



***Undercover Repossession Ruse – May 1, 2025***

56.     Between April 24, 2025, and May 1, 2025, a UC engaged in conversation with Rivas-Mendez discussing an additional vehicle repossession job for Rivas-Mendez and some of his criminal associates.

57.     On May 1, 2025, Rivas-Mendez and two (2) individuals identified as ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and a juvenile drove to the UC Location to meet with the UCs for the purpose of assisting the UCs with the repossession of a vehicle. After arriving at the UC Location, a UC, CI, Rivas-Mendez, ▮▮▮▮▮▮▮▮▮▮▮ and the juvenile got into an undercover vehicle (UCV-1) and left the UC Location together.

58.     As a UC, CI, Rivas-Mendez, ▮▮▮▮▮▮▮▮▮▮ and the juvenile were driving together in UCV-1 to conduct the vehicle repossession, Rivas-Mendez advised that he and his associates were armed. Rivas-Mendez further advised that both of his associates, ▮▮▮▮▮▮▮ and the juvenile who were in the backseat of the UCV with the CI, were also both armed. The UC, CI, Rivas-Mendez, ▮▮▮▮▮▮▮▮▮and the juvenile then drove to a pre-staged location for the repossession ruse where they met with additional UCs. Once the repossession ruse was complete and an additional undercover vehicle was obtained (UCV-2), Rivas-Mendez got into the car with two UCs, while another UC, CI, ▮▮▮▮▮▮▮▮▮and the juvenile drove back separately to the UC Location.

59.     On the ride back to the undercover location in UCV-2 with two UCs, Rivas-Mendez advised the UCs that he was trying to show off and then retrieved a black pistol from the shoulder

bag that he was wearing and set it on the center console of UCV-2 in plain view of the UCs. Rivas-Mendez advised the UCs that he would be willing to sell the firearm depending on the price. Rivas-Mendez left the loaded pistol out in plain view on the vehicle console for the duration of the drive back to the undercover location.

60.     The UCs asked Rivas-Mendez if ███████████ and the juvenile were also carrying firearms and Rivas-Mendez advised that they were carrying the same type of firearm that he had, but that they would not be selling those because those firearms were their personal firearms. Rivas-Mendez advised the UCs that a friend was putting a firearm together for him that has a chromed-out slide with a blue frame but further stated that he didn't have the firearm yet because he didn't have enough money.

61.     Rivas-Mendez advised the UCs that he was trying to "shoot lead" today to start it off and be called "assassins." The UCs then advised Rivas-Mendez that there was a hotel nearby where the UCs would sometimes take women, and Rivas-Mendez responded that he knew that location because he did construction jobs near there. The UCs advised Rivas-Mendez that UCs would also be ready to purchase more tusi next week but further stated that they can't sell any narcotics right now due to territorial disputes. The UCs advised Rivas-Mendez that if the UCs were caught selling narcotics in a rival gang's area that it would result in a shootout with the rival gang. Rivas-Mendez replied that he knows how that type of situation goes. Rivas-Mendez then advised the UCs that he had ten (10) ounces of tusi ready to sell.

62.     On the ride back to the undercover location in UCV-1 with a UC, the CI, ███████████████ and the juvenile, the UC and CI asked ███████████████ and the juvenile if they had done this type of activity on previous occasions. ████████████████ and the juvenile advised the UC and the CI that they have previously engaged in this type of activity in Venezuela. ████████████ and the juvenile further advised that they are quiet people, but that they are interested in doing anything.

63.     ████████████████ and the juvenile stated that if they UCs needed them to assist with jobs in the future, the UCs should contact Rivas-Mendez. They further advised that ███████████ ████ is Rivas-Mendez's younger brother, and the juvenile is Rivas-Mendez's cousin. ████████████ ████ and the juvenile advised the UC and CI that they are down for beating people up and that they do this type of activity together all the time anywhere. The CI asked if they would take extreme measures in necessary situations and ██████████████ responded saying they would shoot someone in the head, if necessary, like they do in Venezuela. ████████████████ advised they are all a part of one group and that communication runs through the one group. The CI asked if they had more people in case they were needed and ████████████████ and the juvenile then began to advise that if the UCs needed a stabber or an assassin/hitman, ████████████ and the juvenile would be able to provide that for the UCs. The UC and CI advised that the UCs were currently in conflict with a local motorcycle gang. ████████████████ and the juvenile replied that the motorcycle gangs weren't violent or tough, but that ████████████████ and the juvenile were the tough/violent ones. ████████████████ and the juvenile advised they do not like to talk but like to do, and they show through their work.

64.     ████████████████ and the juvenile then advised the UC and CI that whenever they were needed to go kill or do a job that they would be available and would want to talk about pricing

with the UCs. ████████████ and the juvenile advised that each state in the U.S. has their own boss and they all report through that one boss. ████████████ and the juvenile stated their boss knew what activities they were involved in each time they conducted a job. ████████████ and the juvenile again advised that if the UCs need someone to kill or stab, they would be able to provide that specific type of worker for the UCs. ████████████ and the juvenile further advised they had many people to provide for the UCs, but the UCs would just have to coordinate any job through Rivas-Mendez.

65.     After everyone got back to the UC Location, the UCs paid Rivas-Mendez, ████████████ and the juvenile in pre-recorded buy money/U.S. Currency each individually for their assistance with the vehicle repossession. Additionally, the UCs paid addition pre-recorded buy money/U.S. Currency to Rivas-Mendez for the purchase of the firearm that Rivas-Mendez carried during the job, which was a Beretta, model APX A1, 9mm caliber pistol, bearing S/N: AXC121371, and was loaded with 9mm caliber ammunition.

66.     With regards to the Beretta pistol purchased from Rivas-Mendez, Alex Peña sent a picture of the Beretta pistol on April 26, 2025, and stated "Tengo esa" which translates as "I have that."

67.     On May 1, 2025, after the conclusion of the undercover interaction with Rivas-Mendez, ████████████ and the juvenile, a UC placed a controlled phone call to Rivas-Mendez. Rivas-Mendez advised the UC that he had helped (understood to be referring to participating in the ATF UC repossession operation) and he had negotiated a payment amount with his associates for participating in the repossession operation. Rivas-Mendez further stated, "You offered me a price, and I offered another price to the two (2) individuals that I took. However, when we were there, they (understood to be referring to the ATF UCs) changed the script and what I need is that you talk to your boss because I don't want what happened today to ever happen again." The UC then asked Rivas-Mendez if the UCs had changed the payment price on him to which Rivas-Mendez stated, "What happened is that I already had a deal with my people and my agreement with my payment price is something different because I negotiate that with them. You can't change the script with my people. You can change the script with me but not with my people because I look for my people through someone else and I then have to offer that person a price and then that person offers the people another price."  Rivas-Mendez further stated, "What I don't want to happen is what happened today so talk to your boss, because your boss needs help, your boss can talk to me and I will talk to my people. Your boss needs to pay me and not pay my people because your boss is negotiating with me and the one responsible for my people is me." The UC advised Rivas-Mendez that the UC would speak to the UCs. Rivas-Mendez then stated, "I have an elder who charges me for the people that help and so I set a price, but when they (understood to be referring to the ATF UCs) pay the guys $500 and the elder had already offered to pay the people that helped $300 because he was going to keep half. I hope this doesn't happen again if you want to keep doing business with me because I respect your decision. Now, I have to give up what profit I made to pay the elder."

16



*Undercover Communications – May 2, 2025*

68.     On May 2, 2025, the WhatsApp number ▮▮▮▮▮▮▮▮ with the WhatsApp contact "~ 👋rey De Yeres 😍 🥳" contacted a UC and offered multiple firearms for sale by sending pictures of firearms. The individual utilizing the WhatsApp contact "~ 👋rey De Yeres 😍 🥳"advised the UC he was the same individual who had been utilizing WhatsApp contact "~Peña alexdaniel 🔘 🍒 😍."  Subsequent investigation supports that they are the same person, and therefore that person will be referred to also as "Alex Peña."

### *Undercover Purchase – May 07, 2025*

69.     Between April 25, 2025, and May 7, 2025, a UC engaged in conversation with both Rivas-Mendez and Alex Peña regarding purchasing multiple firearms and narcotics, specifically a drug called "tusi", from Rivas-Mendez and Alex Peña. During these recorded communications, Alex Peña was utilizing WhatsApp contact "~ 👋rey De Yeres 😍 🥳" with WhatsApp number ▮▮▮▮ ▮▮▮▮▮▮.

70.     On May 07, 2025, Rivas-Mendez and an individual identified as Antony Diaz-Gonzalez drove to the UC Location to meet with the UCs. Rivas-Mendez and Diaz-Gonzalez arrived at the UC Location in a red Kia sedan bearing Colorado license plate ▮▮▮▮▮▮. During the meeting, the suspects opened the trunk of the red Kia sedan and removed items from a clothing hamper located in the trunk. Rivas-Mendez produced two firearms specifically a Sig Sauer, model P365, 9mm caliber pistol, bearing S/N: 66F706087, and an SCCY, model CPX-2, 9mm caliber pistol, bearing S/N: C229415. Rivas-Mendez agreed to sell the firearms to the UCs. The UCs paid Rivas-Mendez in pre-recorded buy money/U.S. currency for the firearms. Rivas-Mendez also produced approximately 90 grams of tusi to sell to the UCs. The UCs paid Rivas-Mendez in pre-recorded buy money/U.S. currency for the purchase of 90 grams of tusi.



*Undercover Purchase – May 08, 2025*

71.     On May 8, 2025, a UC engaged in conversation with the individual who was communicating with the UC utilizing WhatsApp phone number ▆▆▆▆▆▆▆ with WhatsApp contact "Voy" regarding purchasing multiple firearms and narcotics, specifically a drug called "tusi".

72.     On May 8, 2025, Voy provided an address of 2247 S Monaco Pkwy, Denver, Colorado 80222, as the location for the UCs to meet and purchase firearms and tusi. On May 8, 2025, UCs traveled to this location and purchased multiple firearms and approximately 150 grams of tusi from a previously unidentified Hispanic male, who was subsequently identified as Santtys Jose Silva-Alvarez. Specifically, one of the firearms purchased was a lime green pistol, described as an SCCY, model CPX-2, 9mm caliber pistol, bearing S/N: 376895, and the other firearm was a Smith and Wesson, model SW40F, .40 caliber pistol, bearing S/N: PAZ4969

73.     Also on May 8, 2025, Alex Peña, utilizing WhatsApp contact "~ 👋 rey De Yeres 😍 🥳 " with WhatsApp number ▆▆▆▆▆▆▆, contacted the UC to inform the UC that Alex Peña knew the UC was "going to look for two pistols and a tussi." Alex Peña was advising the UC that Alex Peña knew the UC was conducting business with the person utilizing the WhatsApp contact "Voy" and Alex Peña was upset the UC was not conducting business with Alex Peña.



## Murder for Hire Discussions – May 13-14, 2025

74.     Between May 1, 2025, and May 15, 2025, a UC engaged in conversation with both Rivas-Mendez and Alex Peña regarding Rivas-Mendez and other individuals being willing to commit a murder-for-hire on behalf of the UCs. Alex Peña was utilizing WhatsApp contact "~ 👋 rey De Yeres 😍 🥵" with WhatsApp phone number ████████████ during these recorded conversations.

75.     More specifically, on May 13, 2025, a UC placed a phone call utilizing WhatsApp to Rivas-Mendez discussing Rivas-Mendez and his associates being willing to commit a murder on behalf of the UCs. Previously, during the undercover meetings with Rivas-Mendez on April 16, 2025, and May 1, 2025, Rivas-Mendez and his associates who interacted with the UCs made numerous statements to the UCs indicating that they were willing to commit violent crimes, to include murder, on behalf of the UCs for a fee. Rivas-Mendez and his associates advised the UCs they conduct this type of activity often, and have committed violent crimes, to include murders, in their county of Venezuela. Rivas-Mendez and his associates advised the UCs that if someone owes a debt in Venezuela and they don't pay their debt, Rivas-Mendez's associates would shoot the debtor in the head and then take all of their personal belongings.

76.     Due to their willingness to commit violent crimes, to include murder, on behalf of the UCs for a fee, the UCs then approached Rivas-Mendez about a specific situation that arose that might need a violent crime committed. During the recorded phone call on May 13, 2025, a UC asked Rivas-Mendez if he was serious about committing a violent crime, to include murder, like he had previously advised. Rivas-Mendez confirmed that he and his associates were serious about committing a murder for a fee. Immediately following that phone call, Alex Peña attempted to contact the UC utilizing WhatsApp contact "~ 👋 rey De Yeres 😍 🥵" with WhatsApp phone number ████████████. Shortly after that attempted phone contact, Rivas-Mendez advised the UC that Rivas-Mendez's boss was attempting to get ahold of the UC. Rivas-Mendez then forwarded a voice message to the UC that had Alex Peña's voice. Alex Peña advised that he will "activate" several individuals to commit a murder on behalf of the UC for a fee. Alex Peña advised that because "homicide" in the United States is a serious offense, Alex Peña and his associates needed to be paid an appropriate fee to commit the murder.

77.     Following the voice message the UC received from Rivas-Mendez on May 13, 2025, the UC had a phone call with Alex Peña, utilizing WhatsApp contact "~ 👋 rey De Yeres 😍 🥵" with WhatsApp phone number ████████████. The UC discussed with Alex Peña if the job is something he and his people would be willing to conduct. Alex Peña advised the UC it is something they would conduct for the right payment.

78.     On May 14, 2025, Alex Peña sent a picture of two black semi-automatic pistols and a silver revolver to the UC. Alex Peña advised the UC that the individuals who were going to commit the murder on behalf of the UCs for a fee would be using these firearms. These firearms were be the same three firearms that were subsequently recovered by the ATF on May 15, 2025, as described below.

19



79.     Also on May 14, 2025, after engaging in recorded communications with both Rivas-Mendez and Alex Peña, a UC advised Rivas-Mendez that the UCs wanted to speak to Rivas-Mendez in person about the murder-for-hire job. After requesting the meeting, Rivas-Mendez and Diaz-Gonzalez (who had previously driven Rivas-Mendez to the UC Location to sell firearms and tusi to the UCs) arrived at the UC location. During the meeting, the UCs explained to Rivas-Mendez and Diaz-Gonzalez that one of the UCs whom Rivas-Mendez and Diaz-Gonzalez had previously met got beat up by a rival gang. As previously discussed on May 13 and May 14 in recorded communications, Rivas-Mendez and Diaz-Gonzalez engaged in conversation with the UCs discussing committing murder to fight back the rival gang. While discussing the method of revenge, Rivas-Mendez stated, "Look, I have to ask you this question because the government is tough, and I have to find my people a way in and a way out. I have to make sure my people are taken care of. We are not going to play. If we go in we have to burn everything and have to take out everyone." At the same time, Diaz-Gonzalez asked the UCs, "Do you want to beat him up or do you want to kill him." Rivas-Mendez then got up from his seat and asked the UCs, "Have you never seen a video of Venezuelans when they go in and kill? They go in and take everyone out" (Rivas-Mendez then got up from his seat and simulated shooting an air gun and pretended to shoot people). Rivas-Mendez further stated, "They don't go inside asking who is who. If you give me a photograph and ask that they bring you the body then they will bring you the body." Rivas-Mendez then stated while referring to the UC who had gotten beat up by the rival gang, "They beat him up pretty badly so we have to kill them. If they get ahold of him again (understood to be referring to the UC purported to be beat up), they are going to kill him. You have to kill them. You guys are going to be in a war with those people."

80.     The UCs then asked Rivas-Mendez how much he would charge for the murder of two (2) people. Rivas-Mendez then stated, "I am going to be clear and I am going to talk to the boss. In your country (understood to be referring to the U.S.) we will not kill a white dog. A Latino will be easier. How much do you offer me so I can then talk to my boss. You give me a price and I can call him right away. He will then tell me, yes take it or leave it." One of the UCs then advises another UC that Alex Peña had previously asked to be paid $5,000 via text message. The UCs then offered to pay Rivas-Mendez and his associates $5,000 per person. Rivas-Mendez then stated, "This is what I told him (understood to be referring to Alex Peña) because he once asked me. If he is white, it is more expensive. We are not going to kill a Latino or any other person. It will be a crazy problem and will look for him even under rocks." The UCs then asked Rivas-Mendez if he had to call his boss to confirm how much they wanted to get paid for the murder.

81.     Rivas-Mendez then asked, "Ok, so for two (2) people it will be $10,000?" The UCs then asked Rivas-Mendez who would receive the payment to which Rivas-Mendez replied, "It will be to me. That is why I am here today and tomorrow when the other individuals come, I will be here too." The UCs then advised Rivas-Mendez that the UCs will pay him $10,000 as payment for the murder of two (2) individuals. The UCs then asked Rivas-Mendez how much would his boss get paid to which he stated, "I don't know how much he (understood to be referring to Alex Peña) will get paid because I am sure you already talked to him." Rivas-Mendez then asked, "How many individuals did he promise you, four or five? You guys haven't talked about price?" The UCs then advised Rivas-Mendez that the UCs would call Alex Peña and confirm the payment amount.

82.     A UC then placed a phone call to Alex Peña, utilizing WhatsApp contact "~ 🍬 rey De Yeres      🥵" with WhatsApp phone number ███████████. While the UC was placing the telephone call, Rivas-Mendez stated to the UCs, "We have to kill those people." Alex Peña answered the UC's telephone call and the UCs then provided the phone to Rivas-Mendez. Rivas-Mendez then advised Alex Peña that the UCs were offering to pay $10,000 for the murder of two (2) individuals. Alex Peña then stated, "How about $15,000?" Alex Peña then asked the UCs for half of the payment and requested that the remaining half be paid after the murder was committed. The UCs then advised that the UCs were willing to pay a total of $15,000 but did not have the money and would have it all the next day. The UCs advised Alex Peña that the UCs would pay him half of the payment when his associates arrived and the other half once the murder was committed. Alex Peña then agreed to the payment arrangement.

83.     The UCs then advised Rivas-Mendez that the rival gang took a vest from the UC when they beat him up. The UCs offered a bonus of $2,000 if Rivas-Mendez and his associates brought back the vest to the UCs. Rivas-Mendez then asked the UCs if he could take a photograph of the vest and walked towards his vehicle to retrieve a cellphone. Rivas-Mendez then asked, "If we bring back their heads how much would you pay us? We take care of that quickly with a machete." The UCs then advised that the UCs would pay a total of $20,000 to which Rivas-Mendez replied, "For the head in hand? Ok you got it."

84.     The UCs then asked Rivas-Mendez and Diaz-Gonzalez if they had murdered before to which Rivas-Mendez replied, "This is like a game to them." Diaz-Gonzalez then stated, "They are used to that." Rivas-Mendez then stated, "This to them is like playing golf for you guys. It's all laughs. Those others are even crazier." The UCs then advised Rivas-Mendez and Diaz-Gonzalez that if any mistakes were made the next day then a war would ensue to which Rivas-Mendez replied, "Don't worry it's going to be a war tomorrow." Rivas-Mendez then stated, "Look, if you don't give me the details correctly, and there are more people, they are going to take out everyone that are around them. Make sure you give the individuals photos and the correct location if you only want two." Rivas-Mendez then advised he would advise his people and would return the following day to conduct the murder.

### Murder for Hire – May 15, 2025

85.     On May 15, 2025, Rivas-Mendez and three previously unidentified individuals, subsequently identified as Deomar Armando Mendez-Chavez, Dannys Alexis Moncada-Arteaga, and Jose Daniel Bencomo-Gutierrez, arrived at the UC Location, in order to commit a murder on behalf of the UCs. During the meeting on May 15, 2025, the individuals who were present produced

three firearms. In the presence of the UCs, the individuals wiped down their firearms with Clorox cleaning wipes. The individuals also unloaded the three firearms, wiped down each round of ammunition with the Clorox cleaning wipes, put on surgical gloves, and re-loaded their firearms with the cleaned ammunition while wearing the gloves. The individuals discussed their willingness to commit a murder on behalf of the UCs for a fee. The individuals demonstrated to the UCs how they were going to kill two people on behalf of the UCs. The individuals asked the UCs if they would get a bonus payment if they brought back the heads of the individuals they killed as proof to the UCs that the murder of the individuals was completed.

86.     Throughout the undercover interaction on May 15, 2025, Rivas-Mendez was observed to make multiple calls to Alex Peña.  During the calls, Alex Peña interacted with the UCs, discussing the payment the UCs would provide for the individuals committing the murder on behalf of the UCs. Alex Peña was also observed advising the individuals how they will commit the murder.

87.     After placing two of the loaded firearms into the back of a vehicle they would drive to commit the murder, Rivas-Mendez, Bencomo-Gutierrez, Mendez-Chavez, and Moncada-Arteaga were taken into custody. After being taken into custody, the four suspects each had a cell phone recovered in their possession. The cell phone recovered in the possession of Rivas-Mendez is the cell phone Rivas-Mendez had been utilizing to communicate with the UC during this investigation. Immediately following the arrest, the cell phone recovered in the possession of Rivas-Mendez was observed to have numerous incoming calls coming from the WhatsApp phone contact "~ 👋 rey De Yeres 😍 🥵" with WhatsApp phone number ████████████ (Alex Peña).

## INTERSTATE NEXUS

88.     All of the firearms described above, except those firearms that contain no make, no model, or no serial numbers, were preliminarily examined by an ATF Special Agent who has acquired knowledge and experience relating to firearms and ammunition and specifically the interstate nexus determination of firearms and ammunition through training, investigations, extensive research and review of records, as well as conferring with other experts and contacts within the firearms industry. Based on the preliminary examinations, all the firearms described above, except those firearms that contain no make, no model, or no serial numbers, are firearms as defined in Title 18 U.S.C., Chapter 44, Section 921(a)(3), and that these firearms were not manufactured in the State of Colorado, and therefore traveled in and/or affected interstate and/or foreign commerce prior to being recovered as part of this investigation.

## DRUG TESTING

89.     The tusi purchased by the UCs in the above transactions was tested and found not to contain controlled substances.  However, statements by sources of information and subjects of the investigation support the fact that the individuals involved in the above transactions believed the tusi to contain controlled substances, including ketamine.

## CONCLUSION

90.     Based on the aforementioned information, Your Affiant submits that probable cause exists that on or about April 2, 2025, through April 25, 2025, in the State and District of Colorado,

the defendants, Jose David Rivas-Mendez, Deomar Armando Mendez-Chavez, Dannys Alexis Moncada-Arteaga, and Jose Daniel Bencomo-Gutierrez, committed violations of use of a facility of interstate commerce with the intent to commit murder for hire, and conspiracy to do the same, in violation of 18 U.S.C. § 1958(a).

91.     As such, Your Affiant respectfully requests that the Court issue a criminal complaint and a corresponding arrest warrant for and against Jose David Rivas-Mendez, Deomar Armando Mendez-Chavez, Dannys Alexis Moncada-Arteaga, and Jose Daniel Bencomo-Gutierrez.

92.     I, ███████████ Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), being duly sworn, hereby depose and state that the above-mentioned information is true to the best of my information, knowledge and belief.

/s/ ███████████
███████████
ATF Special Agent

**Affidavit reviewed and submitted by Garreth Winstead, Assistant United States Attorney.**

Sworn to and subscribed before me this 13th day of June, 2025.

_____
SCOTT T. VARHOLAK
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLORADO